IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| A.W., an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Docket No.: _____ |
| v. | ) | |
| | ) | *Plaintiff Demands* |
| VEER INVESTMENTS LLC; | ) | *a Trial by Jury* |
| | ) | |
| Defendant. | ) | |

---

**COMPLAINT**

---

Matthew B. Stoddard
THE STODDARD FIRM
1534 N Decatur Road
Atlanta, GA 30307
P: 470-467-2200
F: 470-467-1300
matt@legalhelpga.com

**Attorneys for Plaintiff**

**TABLE OF CONTENTS**

I.      Introduction.................................................................................................3

II.     Procedural Issues..........................................................................................6

III.    Facts..............................................................................................................8

        A.  Plaintiff's Trafficking at the Travel Inn...........................................8

        B.  Information Regarding the Travel Inn and
            Plaintiff's Experience Not Being Unique........................................16

            1.  Online Reviews........................................................................17

            2.  News Stories............................................................................19

            3.  Law Enforcement Activity.......................................................21

        C.  Policies and Procedures that Facilitated
            Plaintiff's and Others' Sex Trafficking.........................................22

        D.  Industry Knowledge........................................................................25

        E.  Defendant's Knowledge as to Plaintiff...........................................29

IV.     Count 1: TVPRA Civil Beneficiary Claims.......................................32

V.      Count 2: Premises Liability Law........................................................37

VI.     Causation And Damages.....................................................................40

VII.    Jury Trial............................................................................................42

VIII.   Prayer For Relief................................................................................42

# I. INTRODUCTION

1.     This case involves the sex trafficking from 2015 to early 2017of a minor – namely Plaintiff A.W. – at a Charlotte hotel known for commercial sex.

2.     The hotel, which was known at the time as the Travel Inn, is located at 5115 Reagan Dr., Charlotte, North Carolina 28206 (the "hotel", "Travel Inn," or "Defendant's hotel").

3.     The Travel Inn was a known hotspot for drugs, prostitution, sex trafficking, and violent crime. It is one of a handful of hotels just off of Sugar Creek Road near its intersection with Interstate 85 that are infamous in Charlotte for commercial sex. The Travel Inn is one of the hotels in that area with the worst problem with commercial sex, and the problems that commercial sex brings with it such as illegal drugs and violence.

4.     Defendant was aware of its hotel's reputation and, instead of acting to combat the problem, chose to act to create a safe space for those seeking to engage in commercial sex and sex trafficking without fear of detection or consequence. Defendant profited off the increased room rentals this system created (i.e. creating a safe space for sex trafficking, human trafficking, commercial sex, and other crime).

5.     Defendant Veer Investments LLC bought the hotel in 2007 and owned it until April 4, 2018. At all relevant times, Defendant Veer Investments LLC owned, operated, and managed the Travel Inn.

6.     Upon information and belief, Defendant was warned on numerous occasions prior to and during Plaintiff's trafficking by law enforcement, City of Charlotte officials, news articles, reporters, and the overwhelming and unignorable presence of crime at the hotel that the Travel Inn was a haven for drugs, prostitution, sex trafficking, and other violent crime.

7.     Given the above, Defendant knew or should have known that changes had to be made at the Travel Inn. However, instead of contacting law enforcement, hiring appropriate

security, or taking other reasonable measures to deter crime, Defendant chose to profit from the room revenues brought in by those seeking to commit crimes, and to provide cover for criminals seeking a place free of repercussions.

8.    As a direct and foreseeable result of Defendant's actions and inactions, the then-minor Plaintiff in this case was brought to Defendant's hotel to be trafficked, beaten, threatened, repeatedly raped, and sold for sex.

9.    Defendant had every reason to know about what was happening to this specific Plaintiff and that it was facilitating her trafficking.  When Plaintiff was brought to Defendant's hotel, the following occurred:

   a.    Defendant's front desk employee steered Plaintiff and her trafficker to areas of the hotel where law enforcement was less likely to be present and where the johns coming to Plaintiff's room would be less conspicuous;

   b.    The hotel agreed that there would be no housekeeping to Plaintiff's room for the entirety of her stay;

   c.    Instead, the trafficker himself would pick up towels and sheets multiple times for multiple days in a row from the hotel staff;

   d.    The trafficker left trash cans full of used condoms for housekeeping;

   e.    Many men per night would drive past the front office, drive to the rear of the hotel near Plaintiff's room, park in the parking lot, enter Plaintiff's room, and stay for only 15 to 30 minutes before leaving and driving past the front desk again;

   f.    The trafficker forced Plaintiff, who was and appeared to be under the age of 18, to wear revealing clothing and keep her head down when in the public areas of the hotel such as the parking lot;

g. The trafficker would loudly beat, threaten, bruise, and argue with Plaintiff such that hotel employees and others could hear and see said events and injuries and then the staff would continue to rent the room to the trafficker;

h. The trafficker would regularly and repeatedly wait outside Plaintiff's room to collect money from "johns" visiting Plaintiff for sex; and

i. Upon information and belief, the hotel staff would often not call police despite have strong suspicion that crimes were occurring at the property.

10. In short, Defendant profited not just from the room rentals of the unsavory element it attracted with its policies, Defendant also knew and had every reason to know that it was profiting from the sex trafficking of this then-minor Plaintiff, and then with that knowledge, the Defendant aided in providing Plaintiff's trafficker a safe space to operate that catered to his needs. As such, Defendant is liable for Plaintiff's damages under 18 U.S.C. § 1595(a) (the "TVPRA") and North Carolina's premises liability law.

## II. PROCEDURAL ISSUES AND PARTIES

11. Given the nature of the case, A.W. is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel has previously disclosed her full name to defense counsel or will do so as soon as counsel identify themselves. Separately, Plaintiff will file a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously after the mandator conference under LCvR 7.1(b).

12. A.W. is a natural person who is currently a resident and citizen of Illinois.

13. Defendant Veer Investments LLC is a North Carolina limited liability company with its principal place of business in Waxhaw, Union County, North Carolina.

14. Defendant Veer Investments LLC was served with the original complaint and summons through its agent, Kamlesh K. Patel, 12400 Wake Union Church Rd., Suite 3, Wake Forest, North Carolina 27587.

15. Kamlesh K. Patel is also known as Kamiesh K. Patel and as Kamleshkumar K. Patel.

16. Defendant Veer Investments LLC was properly served with process in this matter.

17. Defendant Veer Investments LLC is subject to the jurisdiction and venue of this Court.

18. In April 2018, Defendant Veer Investments LLC sold the hotel for $2.1 million.

19. On February 4, 2020, the North Carolina Secretary of State filed a Certificate of Administrative Dissolution stating that Veer Investments LLC was administratively dissolved for failure to file an annual report.

20. Upon dissolution, Defendant Veer Investments LLC distributed its assets, including the proceeds from the sale of the hotel to its shareholders, which upon information and belief include Kamlesh K. Patel.

21. Defendant Veer Investments LLC did not publish a notice of dissolution under G.S. § 55-14-07(a) and (b).

22. Defendant Veer Investments LLC is liable under N.C. Gen. Stat. § 55-14-08(a)(1) for any undistributed assets, including any applicable insurance coverage.

23. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question jurisdiction) because this matter concerns the Trafficking Victims Protection Reauthorization Act ("TVPRA") a/k/a 18 U.S.C. § 1595, *et sec*., which is/are law(s) of the United States.

24.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in Charlotte, North Carolina which is within the Western District of North Carolina.  *See* 28 U.S.C. § 1391.

## III. FACTS

**a.     Plaintiff's Trafficking at the Travel Inn**

25.     In 2015, Plaintiff was 16 years old when she was first trafficked at hotels in Charlotte, North Carolina, including Defendant's hotel.

26.     In 2015, Plaintiff met Daniel Thomas online while she was living at group home in North Carolina. She ran away from the group home, and Thomas took her to various Charlotte-area hotels, including Defendant's Travel Inn.

27.     Thomas took photos of Plaintiff wearing little or no clothing and posted them on Backpage.com to advertise Plaintiff for commercial sex.

28.     When the "johns" responded to the backpage.com postings, Thomas would direct them to a hotel room that he rented for the purpose of trafficking Plaintiff for sex.

29.     Thomas lead Plaintiff to believe that he loved her, and Thomas lied to Plaintiff and committed fraud to get her to engage in commercial sex. Thomas also used force and violence to coerce Plaintiff into having commercial sex and to enforce his rules and control Plaintiff. If Plaintiff resisted or objected to his commands or rules, she was met with threats of violence or actual violence.

30.     On several occasions, Thomas took Plaintiff to the Travel Inn and commanded Plaintiff to have sex with many strange men per night.  Plaintiff was under 18 years old on all visits the Travel Inn.

31.     In exchange for sex with the then-underaged Plaintiff, the above-mentioned men or "johns" would pay Thomas for their visit or "date" with Plaintiff. Thomas then used the money earned from Plaintiff's commercial to pay for subsequent nights' stays at the Travel Inn.

32.     At all times during Plaintiff's trafficking period, Thomas would keep all of the money A.W. made engaging in commercial sex; he was always watching or within a short distance of Plaintiff; he would threaten her if she were to tell anyone about her situation; and he physically abused Plaintiff, beating her up, her when she would not submit to his will. Thomas' beatings left bruises on Plaintiff that were visible to anyone who saw her.

33.     Thomas gave heroin to A.W. to keep under the influence of illegal drugs to further keep her under control, to lower her resistance to having sex with the strange men, and to enable her to "work" many hours without stopping to sleep.

34.     Thomas trafficked Plaintiff for commercial sex at a few different hotels in Charlotte area. Thomas would traffic Plaintiff at one of those hotels for a period of time before moving on to another.

35.     Thomas took Plaintiff Defendant's Travel Inn to traffic her for sex on several occasions.

36.     Thomas would stay at the Travel Inn with Plaintiff for a period of approximately one or two weeks, before moving on to a different hotel. After some time away from the Travel Inn, Thomas would return to Defendant's hotel and again traffic.

37.     Thomas would pay for the rooms at the Travel Inn in cash, typically paying for his room one day at a time, returning each day to pay for one more day.

38.     Thomas was a frequent customer of the Travel Inn and was well-known to the staff at the hotel.

39.     Plaintiff was a minor at the time, and Plaintiff plainly appeared to be well under 18 when she was at the hotel. Thus, it was clear to all hotel employees who saw Plaintiff that she was under age.

40.     Thomas was approximately 23 years old at the time. He clearly appeared to be an adult. He was an adult at a hotel known for commercial sex with Plaintiff, a minor girl who was obliviously under-age.

41.     Thomas used the rooms that he rented at the Travel Inn as a location to traffic Plaintiff for commercial sex.

42.     Thomas took the money that he was paid for Plaintiff's commercial sex and paid it to the hotel to pay for subsequent nights at the hotel.

43.     When the johns responded to Thomas' on-line advertisements of Plaintiff, Thomas would direct the men to a particular room at the Travel Inn.

44.     The Travel Inn is comprised of two rectangular buildings at right angles to one another. The only entrance to the hotel is off of Regan Drive. The entrance is marked with the red arrow, and the yellow arrow shows the location of the lobby/front desk:



45.     Sometime in 2009 or before, the Defendant installed a gate to prevent hotel guests from driving to the rooms on the back side of the buildings without having to drive past the lobby and front desk. The gate location is marked on this photo with the blue arrow:



46.     The gate is kept closed, and prevents vehicle traffic from driving around the building in a clockwise direction:



47.     The gate that Defendant installed channels all hotel traffic right past the front desk. The font desk is opposite a large window, and the front desk employee has a clear view out the window to all traffic coming into the hotel. That was the purpose of the gate, to enable the front desk worker to see all vehicle traffic in and out of the hotel through these front doors and window:



48.     The "johns" who visited Plaintiff's hotel room to have commercial sex with Plaintiff had to drive into the parking lot where the front desk worker and other employees could

see them coming into the hotel and then drive to Plaintiff's room. The front desk workers and other employees could also see multiple "johns" getting out of the vehicles walking to Plaintiff's room, and walking back to their car a short time later and driving out of the hotel.

49.     On a typical night, many johns came to Plaintiff's room each night to have sex with her. This resulted in a high amount of foot traffic to Plaintiff's hotel room each night.

50.     When a john came to Plaintiff's room to have commercial sex with her, Thomas would leave the room, either standing outside the room or sitting in his vehicle. Either way, he was visible to hotel staff loitering outside of the hotel room numerous times per night.

51.     When Plaintiff stayed at the Travel Inn, the following occurred:

a.  On her way to or from the room and at other times Plaintiff was outside the room, Plaintiff kept her head down and not speak to anyone – including Defendant's employees.

b.  When Plaintiff was in parking lot or common areas of the hotel, she appeared:

    i.   Dressed inappropriately in provocative and revealing clothing;

    ii.  At times displaying bruising and scars;

    iii. To be under the influence of drugs; and

    iv.  To be obviously underage.

c.  During Plaintiff's stays at the Travel Inn, Thomas arranged with Defendant to suspend housekeeping services.

d.  Even though he refused housekeeping services, Plaintiff's trafficker requested new towels and sheets multiple times.

e.  Because housekeeping had been forgone for days at a time, Plaintiff's trafficker left outside the room trash bags full of used condoms, which housekeeping would see and have to dispose of.

f.  While each of the many men came to Plaintiff's room to have sex with her, Thomas would either wait outside her room or in the parking lot, which was in clear view of housekeeping, maintenance, and other staff.

g.  Plaintiff's trafficker would become angry and abusive towards Plaintiff and would yell or fight in a manner that others, including hotel staff, could hear.

52.  On October 15, 2016, Thomas took Plaintiff to the Sleep Inn in Concord, North Carolina, to have commercial sex with a john. Sherriff's deputies arrested Thomas at the Sleep Inn for attempting to promote prostitution of a minor (Plaintiff) and for possession of a handgun that was found in his front pocket.

53.  Thomas later pleaded guilty to both charges. The court sentenced him to prison and required that he register as a sex offender.

**b.  Information Regarding the Travel Inn and Plaintiff's Experience Not Being Unique.**

54.  Defendant and its employees knew that drug crimes and commercial sex were commonplace at the Travel Inn.

55.  From the first year of ownership or before, Defendant knew that the Travel Inn was located in an area where drugs and commercial sex were rampant. Defendant knew that from several sources including:

a.  Defendant's employees and owners had experience in the hospitality industry and therefore knew that commercial sex was a problem facing the industry and that it was a particularly acute problem for budget hotels such as the Travel Inn.

b. The Travel Inn was located at Interstate 85's exit to Sugar Creek Road. That area is and was infamous for its commercial sex problem. People soliciting for commercial sex in that area was openly solicited and commonplace. Commercial sex was also conspicuous at Defendant's hotel.

c. The police were frequently at the hotel. Police often told Defendant's employees why they were there, which often was because of commercial sex or the problems that came with commercial sex, such as illegal drugs or violent crime.

d. Defendant received online reviews, and sometimes responded to online reviews. Defendant's online review informed Defendant that its guests had seen commercial sex at the hotel and that it was an open and common occurrence at the hotel..

**1.    Online Reviews**

56.    About two months before Defendant purchased the hotel, a former guest posed a review on Tripadvisor.com titled "Drug raid, dingy and scarry" stating:

> Checked in at 4pm in daylight, but by 8pm we were afraid because there were a lot of people hanging outside their rooms. . . .We walked to the McDonald's adjacent to the property at around 8 and saw some creepy things happening and we ran back to our rooms.
>       At 12am we heard the room next to us door get kicked in and yelling "get on the ground". . . .  We saw a swarm of cops and realized it was a drug raid. . . .
>       We have never been so afraid in our lives. . . .
> —Tripadvisor, November 2006.

Presumably, Defendant conducted a due diligence search for information about the hotel before purchasing it in January 2007, so Defendant was aware of this and other reviews.

57.    On October 31, 2012, Kamlesh Patel, who was then the General Manager of the hotel, replied to several Tripadvisor guest reviews for the hotel. Among the reviews he responded to was this one:

[T]he overall feel of the place was creepy, dirty and scary. . . . There were also a lot of shady characters hanging around this place, we took every[th]ing out of truck just to be safe.
—Tripadvisor, July 2012

There were two police cars in the parking lot because apparently there are a lot of drug deals and prostitution at this place on a regular basis. . . .The location is very sketchy with some shady characters but the staff is even worse. I was scared for my life. . . .
—Tripadvisor, April 2013

I asked for a refund before the "10 minute time limit: for a refund and they said no because I had a reservation. . . .
Do not rent a room at this establishment. There were shady clientele (you could tell some were on drugs) and there was a police unit stationed outside, in my opinion because of the area it is located in or due to the cliente[le] that frequent the establishment.
—Tripadvisor, April 2014

Very scary location and very sketchy. . . .Heard a gunshot late at night, I then just had it, I quickly left for the Red Roof Inn nearby, it could not be much worse.
—Tripadvisor, April 2014

[T]here are multiple men hanging around during odd hours, upon entry to the room, we had a big smell which reeked of marijuana . . . . almost got followed to the room by other guests multiple times, must I remind you two younger women in their twenties don't really want to feel uncomfortable during this.
—Tripadvisor, December 2015

I found a capsule with brown powder substance in it . . . and because of the shady neighbors and ambiance of the outside of the hotel I was terrified to walk out without my boyfriend.
—Tripadvisor, February 2018

58.     The hotel's 10-minute policy was mentioned again in this google review for the

Travel Inn:

Drunk wandering around the parking lot, notices all over about no refunds after 10 minutes. 3 cars in parking lot at 6:30 PM, when I asked the clerk where is everybody she said it would start filling up later. With hookers and johns? Ants in room, general bad feeling about place so I left.
—Google, 8 years ago.

59.     Defendant's 10-minute rule was designed to profit from hotel guests involved in commercial sex. By keeping the window for a refund exceedingly small, Defendant were able to collect room rental fees from guests who were using the hotel for a short time for commercial sex. The 10-minute rule prevented those guests from obtaining a refund.

### 2.     New Stories

60.     For decades, commercial sex has been a particularly acute problem near the intersection of Sugar Creek Drive and Interstate 85 where the Travel Inn was located.

61.     In 2013, prostitution and related crimes in the Sugar Creek corridor were rising, so federal and local police targeted the area for a four-month long operation called "Operation Heartbreak Hotel."

62.     Operation Heartbreak Hotel was widely-covered by local media. Those reports include an October 23, 2013, WSOC-TV story noting that police had arrested 20 drug dealers who had use hotels in the corridor to do their business. In the story, CMPD Captain Robert Dance said they were going after the hotels where those criminals do their business. Captain Dance also said that there were a number of injunctions on those hotels, and they were seeking additional injections at that time.

63.     An October 23, 2013, story on WBTV and a story on WFAE both quoted then U.S. Attorney Anne Tompkins, in discussing Operation Heartbreak Hotel, as stating that "as of late, crime in the corridor, including drug crimes, armed robberies and prostitution had been on the rise again." The WFAE article noted that CMPD Captain Robert Dance said that drug dealers would rent out rooms for weeks at a time to sell drugs and that "our goal is for those hotels that aren't complying with the rules and restrictions that we have in place, to shut those down." The WBTV

article also quoted Dance as stating that "a lot of this stuff is happening behind closed doors in the hotel corridor," and "So, this is something that management or people working at the hotel would necessarily see."

64.     On April 15, 2014, WSOC ran a piece reporting that prostitution had gotten worse in the last year or so on the Sugar Creek corridor. The story said that police had a plan to combat prostitution "and the violent crime that [police] say has come with it." The story reported that Sugar Creek had become "a magnet for Charlotte's sex trade," and the reporter introduced the story from the side of Sugar Creek Road with the Travel Inn sign in the background.

65.     In the April 15, 2014, WSOC story, Captain Dance said that "[i]f it wasn't for the prostitution element in all of these cases, I don't think we'd be having the violent crime that we are."

66.     Two weeks later, on May 2, 2014, WSOC ran another piece focused on commercial sex  at the hotels and convivence stores at Interstate 85 and Sugar Creek Road, and the violent crimes that the commercial sex brings with it.

67.     On January 4, 2015, a man who was wanted for murdering his wife was located at the Travel Inn with two teenagers he was not related to. A 12-hour standoff with police follow, during police evacuated all hotel guests. The standoff ended when the man shot himself in his room at the Travel Inn. The incident was widely reported by local new stations and Defendant could not have avoided noticing the large police presence at the hotel.

68.     On May 15, 2015, WSOC ran a story on Charlotte-Mecklenburg police officers "cracking down on drugs and prostitution on Sugar Creek Road at Interstate 85."  Captain Dance stated that "the hotel corridor historically has been a problem for us as it relates to human trafficking and prostitution." WSOC also reported that Captain Dance said he was concerned

because he was seeing some new, often younger, people involved in prostitution who could be victims of human trafficking.

### 3. Law Enforcement Activity

69.     Charlotte-Mecklenburg Police Department received a high number of calls for service to the Travel Inn. From March 2013 through Oct 14, 2016, the police received and responded to following reported crimes, among others, at the Travel Inn:

   a.  1 Forcible Rape

   b.  1 Human Trafficking, Commercial Sex Acts

   c.  1 Missing person under 18

   d.  4 Kidnappings

   e.  5 Overdoses

   f.  1 Suicide

   g.  7 Armed Robberies

   h.  3 Strong Arm Robberies

   i.  3 Indecent Exposure

   j.  13 Drug charges

   k.  4 Aggravated Assaults

   l.  35 Simple Assaults

70.     There also were countless theft charges and other miscellaneous crimes.

71.     Travel Inn employees were aware of all or most of the above crimes because:

   a.  The police would typically tell hotel employees why they had responded to the hotel, particularly for the crimes that were non-theft crimes.

b. Hotel guests who called police would often complain to hotel employees about the crimes they had been victims of and were reporting to the police.

c. When police responded to these calls, the police were visible to hotel employees.

**c.      Policies and Procedures that Facilitated Plaintiff's and Others' Sex Trafficking**

72.     For the purpose of facilitating and catering to the criminal element at the Travel Inn – which includes but is not limited to Plaintiff's trafficker at all relevant times – Defendant engaged in the following behaviors and policies:

a. Defendant continued to rent rooms to those Defendant knew or should have known were engaged in sex trafficking, drug sales, and prostitution.

b. Defendant maintained policies and systems whereby its employees would not call the police on those they knew or should have known were engaged in sex trafficking and prostitution, thereby providing an environment where one could engage in sex trafficking without fear of detection or repercussions.

c. Defendant maintained policies and systems whereby housekeeping services could be suspended, thereby allowing trafficker and other criminals to avoid detection.

d. Defendant maintained policies and systems whereby towels and sheets could be obtained by trafficker many days in a row without question to allow for "johns," pimps, and trafficker' comfort when engaging in commercial sex.

e. Defendant maintained policies and systems whereby the Travel Inn staff would not report clear signs of sex trafficking such as trashcans full of used condoms, pimps surveilling rooms, and high traffic of non-guests coming and going from the hotel.

f. Defendant maintained policies and systems whereby Defendant did not check all guests' I.D.s at the hotel, thereby allowing women, young girls, and "johns" (by the

dozens) to come and go freely from the hotel, which further facilitated pimps and trafficker to conduct their business and avoid detection.

g. Defendant maintained policies and systems whereby it would allow guests to pay for rooms day-by-day and in cash to cater to the needs of trafficker, who would only deal in cash.

h. Defendant maintained policies and systems whereby staff would not call or report signs of sex trafficking, prostitution, or drug sales for the purpose providing a space wherein those engaged in these activities would come back and rent room in order to engage in said vices.

73. Despite warnings from law enforcement, news reports, customer complaints, and the presence of overwhelming and observable crime on the property, Defendant refused to change its above policies and systems.

74. Defendant maintained its policies and systems following those warnings described above for the purpose of creating an environment of low disruption and detection for criminality and to continue to attract and rent rooms to those looking to engaging in illegal activity (like sex trafficking and prostitution) – and thus profiting from said rooms rentals.

75. By Defendant maintaining the above policies and systems and providing Plaintiff's trafficker with hotel rooms over and over again – despite those warnings and red flags described above, both general and specific to Plaintiff – Defendant facilitated Plaintiff's (and others) trafficking by providing a venue that catered to Plaintiff's trafficking, which Defendant knew or should have known about.

76. By Defendant maintaining the above policies and systems and providing Plaintiff's trafficker with rooms over and over again – despite those warnings and red flags described above,

both general and specific to Plaintiff – and providing a venue that catered to Plaintiff's trafficking, Defendant entered into a tacit agreement with Plaintiff's trafficker whereby Defendant provided a venue that facilitated Plaintiff's trafficking and, in exchange, Defendant profited from Plaintiff's trafficking/trafficker through repeated and increased room rentals.

### d. Industry Knowledge

77.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

78.     Defendant knew or should have known of the existence and prevalence of sex trafficking at budget hotels such as the Travel Inn and its illegality since the passage of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*., and publishing of the United Nations' Palermo Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, which was also passed in 2000.

79.     Defendant knew or should have known that in 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—although they may not be criminally liable under the TVPRA—benefit from participation in a venture that they know or should know engages in sex trafficking.

80.     Defendant knew or should have known that, compared to other types of businesses, hotels play a critical role in sex trafficking ventures and serve as "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers[.]" *City of Los Angeles v.*

*Patel*, 135 S. Ct. 2443, 2457 (2015) (Scalia, J., dissenting, joined by Chief Justice Roberts and Justice Thomas).

81.     In 2010 the Department of Homeland Security ("DHS") issued the guidance to hotel companies, entitled Human Trafficking and the Hospitality Industry,[1] which identified a number of warning signs indicating the presence of sex trafficking at hotels. According to DHS, hotel staff can and should be vigilant in observing signs of human trafficking including but not limited to, signs of poor physical appearance (injury, illness, poor hygiene, sleep deprivation, malnourishment), constant monitoring by others, requests for housekeeping and towels without entry into the room, presence of multiple computers or cell phones. Defendant knew or should have known of these warning signs and indicators.

82.     The End Child Prostitution and Trafficking (ECPAT-USA) published list of indicators of human trafficking for hotel staff to recognize and combat trafficking, such as: paying for rooms using cash, paying for multi-day stays one day at a time, escorts various men into the room and lingers until they leave, watching the door, room is frequented by different men, insists on little or no housekeeping, excessive requests for towels and sheets, wearing the same attire or attire that is revealing or inappropriate for the weather, excess lingerie, discarded condoms and lubricants, use of websites with adult classified ads and possessing few personal belongings. Defendant knew or should have known of these warning signs and indicators.

83.     DHS has also previously provided education and guidance for the hospitality industry under the Blue Campaign, because of the hospitality industries' unique situation to

---

[1] https://www.dhs.gov/blue-campaign/hospitalityindustry.

identify and prevent of sex trafficking.  Said guidance includes having hotel staff be vigilant for the following:[2]

    a.  persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    b.  persons who lack freedom of movement or are constantly monitored;

    c.  persons who have no control over or possession of money or ID;

    d.  persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

    e.  requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

    f.  the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

    g.  extended stay with few or no personal possessions in the room;

    h.  excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

    i.  the same person reserves multiple rooms;

    j.  a room is rented hourly, less than a day, or for an atypical extended stay;

    k.  attempts to sell items to or beg from patrons or staff;

    l.  cars in the parking lot regularly parked backward, so the license plates are not visible;

    m.  loitering and solicitation of male patrons; and

    n.  persons asking staff or patrons for food or money.

Defendant knew or should have known of these warning signs and indicators.

---

[2] https://www.dhs.gov/blue-campaign/publication/blue-campaign-toolkits-and-guides.

84.     Defendant knew or should have known that commercial sex in a hotel environment, involving a "pimp," often involves sex trafficking.

85.     At all times relevant to this Complaint, the hospitality industry, which includes Defendant's hotel, knew or should have known about its unique status to observe sex trafficking and the common signs thereof.

86.     At all times relevant to this Complaint, the hospitality industry, which includes Defendant's hotel, knew or should know to implement reasonable training, policies, and procedures to observe for signs of sex trafficking.

87.     At all times relevant to this Complaint, the hospitality industry, which includes Defendant's hotel, knew or should know to be vigilant for the above signs of sex trafficking and to take reasonable measures against the same (e.g. hire security, create policies of reporting crime, not accepting cash payments for rooms, training staff to notice signs sex trafficking, requiring I.D. for all guests, implement card readers, and implement policies whereby housekeeping must enters rooms after 48 hours and place new sheets and towels in rooms).

88.     Defendant knew or should have known that, without a venue, or crime scene, a sex trafficking venture ceases to exist.

89.     At all relevant times, Defendant knew or should have known that there was a heightened risk that sex trafficking could take place at its facility as compared to taking place at other locations because of: (i) extensive private sector / non-profit publications informing the public that hotels were a hotbed of sex trafficking, (ii) extensive federal / state / local government testimony and press quotations informing the public that low income hotels were a particular hotbed of sex trafficking, and (iii) the general nature of Defendant's business involving renting private rooms cheaply by the day with each room having a bed where trafficking could occur.

**e.  Defendant's Knowledge as to Plaintiff**

90.     Defendant directed, operated, supervised, monitored, managed, and/or employed all managers, housekeepers, and other staff at the Travel Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking of A.W. and other crimes at the Travel Inn during the relevant period.

91.     Over the course of the trafficking, the Travel Inn staff had ample opportunity to observe the numerous well-known and visible signs of trafficking victim that Plaintiff exhibited, including her age and inappropriate appearance, physical deterioration, poor hygiene, fatigue, sleep deprivation, no control of or possession of money, loitering, soliciting male patrons, and heavy foot traffic to her hotel rooms.

92.     The heavy foot traffic to Plaintiff's Travel Inn rooms was voluminous and indicative of sex trafficking. A daily parade of men arrived at the Travel Inn, drove right past the front desk, drove to Plaintiff's room, and stayed in the rooms for only 15 to 30 minutes before retracing those steps and leaving the hotel.

93.     Plaintiff's victimization followed a pattern that was readily observable and should have been obvious to Travel Inn employees based on information available to the public at large and to the hotel industry.

94.     Defendant and its employees were warned by online reviews, customer complaints, and police about the high presence of drugs sales, prostitution, and violent crime at the hotel prior to Plaintiff's trafficking period.

95.     Defendant knew and should have known that other women displayed the same signs of trafficking at its hotel prior to Plaintiff being there. However, Defendant similarly profited from said women.

96.     Defendant knew and should have known that Plaintiff displayed the following signs of sex trafficking at all times relevant to this Complaint:

    a.   Plaintiff did not interact with Defendant employee and would keep her head down when in view of Defendant's employees;

    b.   Plaintiff was dressed provocatively for her age;

    c.   Plaintiff appeared bruised in addition to being underaged and dressed provocatively while in the presence of Defendant's employees;

    d.   Plaintiff appeared under the influence of drugs and alcohol (i.e. glossy-eyed, smelling of marijuana, and swaying) while in the presence of Defendant's employees;

    e.   Plaintiff and her trafficker went days without housekeeping services;

    f.   Despite foregoing housekeeping services, Plaintiff's trafficker would request towels and sheets multiple times a day that had to either be left at the hotel room door or picked up by Plaintiff's trafficker in the lobby;

    g.   Because housekeeping had been forgone for days at a time, Plaintiff's trafficker would leave behind trash can(s) full of used condoms upon checkout;

    h.   Plaintiff's trafficker would arrange for many men per night to drive past the front office in clear view of Defendant's employees, park in the parking lot, stay at Defendant's hotel only 15 to 30 minutes while they had sex with A.W., before once again driving past the front desk in clear view as they left;

    i.   Plaintiff's trafficker would become angry and abusive towards Plaintiff, and yell or be violent, in a manner that others, including hotel staff, could hear.

97.     Defendant knew and should have known that the hotel was the subject of:

a. Multiple women soliciting themselves on the property;

b. The smell of marijuana pervasive throughout both the hotel and parking lot;

c. Cars with "johns" coming, going, and passing the front desk after spending only 15 to 30 minutes at the hotel at all hours of the night.

98. Defendant knew and should have been aware that the above are signs of trafficking in the hospital industry such that thew knew or should have known of Plaintiff's trafficking.

99. Defendant knew and should have known that there were reviews online and customer complaints stating there are drug sales at the hotel and prostitutes soliciting themselves at the hotel.

100. Defendant should have known that by failing to correct or warn of the condition at its property (i.e. allowing crime to reign freely and without consequence for the sake of profit) it made Plaintiff's trafficking and multiple rapes foreseeable.

## IV. COUNT 1 – TVPRA CLAIMS

101. Defendant "knowingly benefited" from Plaintiff's trafficking because:

a. the trafficker rented rooms at the Travel Inn;

b. the trafficker used the Travel Inn WIFI network;

c. Defendant collected revenue from the room rentals and the use of the WIFI network; and

d. Plaintiff was advertised for sex through the WIFI network and forced to have sex in the rooms.

102. Defendant took part in at least three different ventures, each alleged in the alternative:

a. Venture 1 – Defendant took part in a commercial innkeeper-guest venture with Plaintiff's trafficker. This venture is a common undertaking in which the Defendant agreed to provide a hotel room in exchange for potential profit to Defendant (i.e., the room rental fee), and the trafficker agreed to provide the fee in exchange for a room in which to stay.

b. Venture 2 –Defendant took part in a commercial sex venture with Plaintiff's trafficker. This venture is a common undertaking in which Defendant provided a hotel room that Plaintiff's trafficker could use as a location for commercial sex. Defendant stood to receive potential profit from room rental fees that it otherwise would not have received, and the trafficker stood to receive profit from the proceeds of the commercial sex.

c. Venture 3 – Defendant engaged in a commercial hotel venture. The participants in this venture include the Defendant and the owners and managers of Defendant, including Kantilal Patel and Kamlesh Patel. They engaged in a common undertaking to involving risk or profit to run the Travel Inn to maximize profits and income.

103. Defendant took part in a common undertaking involving risk or profit with the trafficker (Ventures 1 and 2) because:

a. Plaintiff's trafficker would pay in cash for one night at a time, booking the next night's stay before check-out time;

b. Defendant directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

c. Defendant directly rented rooms to the same trafficker – Plaintiff's trafficker;

d.  Defendant had commercial dealings with Plaintiff's trafficker and then continued to rent rooms to Plaintiff's trafficker.

e.  Defendant had a continuous business relationship with Plaintiff's trafficker such that Defendant established a pattern of conduct with that trafficker.

f.  Before Plaintiff arrived at the Travel Inn for the first night, Plaintiff's trafficker already had rented a room and had prior commercial dealings with Defendant and then reinstated those dealings.

g.  Defendant associated with Plaintiff's trafficker in an effort to force Plaintiff to serve Defendant's business objectives.

h.  Defendant owned, operated, and maintained the Travel Inn in question.

104.  Defendant took part in a commercial hotel venture (Venture 3) because the participants associated and worked together to run the Travel Inn to maximize their profit and income from the Travel Inn. That undertaking involved potential profit if revenue exceeded expenses, and it involved risks, for example, if expenses exceeded revenue.

105.  Plaintiff's trafficker's undertakings with Defendant in Ventures 1 and 2 violated the TVPRA with respect to Plaintiff because:

a.  The trafficker recruited Plaintiff to participate in commercial sex acts at Defendant's Travel Inn by, among other reasons, making Plaintiff work as prostitute;

b.  The trafficker harbored Plaintiff at Defendant's Travel Inn for the purpose of Plaintiff participating in commercial sex acts at the property;

c.  The trafficker transported Plaintiff to Defendant's Travel Inn for the purpose of Plaintiff participating in commercial sex acts at the Travel Inn;

d.  The commercial sex acts occurred at Defendant's Travel Inn in a room rented by Plaintiff's trafficker;

e.  Plaintiff was a minor for the stays at the Travel Inn that occurred early in the trafficking period, and Plaintiff's age was known to Defendant;

f.  The trafficker used force, threats of force, fraud, and coercion to cause Plaintiff to participate in commercial sex acts at Defendant's Travel Inn;

g.  The trafficker threatened Plaintiff with violence and used this tactic to cause Plaintiff to engage in commercial sex acts at Defendant's Travel Inn;

h.  The trafficker de-frauded Plaintiff by falsely telling Plaintiff that he would take care of Plaintiff, and then forcing Plaintiff to work as prostitute for him at Defendant's Travel Inn;

i.  The trafficker coerced Plaintiff to participate in commercial sex acts at Defendant's property by threatening Plaintiff with physical harm if Plaintiff did not engage in commercial sex acts at Defendant's Travel Inn;

j.  The trafficker knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited Plaintiff to engage in commercial sex acts in the Travel Inn rooms that the trafficker rented from Defendant;

k.  Buyers came to Defendant's Travel Inn, purchased the "right" to have sex with Plaintiff from her trafficker, and then the buyers raped the Plaintiff at Defendant's Travel Inn;

l.  Plaintiff's trafficker was aware that Plaintiff was not yet eighteen years of age but nevertheless sold her for commercial sex at Defendant's Travel Inn;

m. The trafficker utilized Defendant's wireless internet connection to communicate with each other and to arrange for the commercial sex acts; and

n. Other actions to be proven at trial.

106. At least one participant of Venture 3 committed a violation of 18 U.S.C. § 1591 as to Plaintiff because:

a. Defendant violated §1591(a)(1) as to Plaintiff. Defendant knowingly harbored Plaintiff, knowing or in reckless disregard of the fact that she was under 18 and would be caused to engage in commercial sex in its hotel rooms. Moreover, Defendant knowingly harbored Plaintiff, knowing or in reckless disregard of the fact that force, threats of force, fraud, and coercion would be used to cause her to have commercial sex in the Travel Inn rooms.

b. Additionally, Defendant violated §1591(a)(2) as to Plaintiff because Defendant had actual knowledge of widespread and ongoing sex trafficking at the Travel Inn and facilitated that trafficking, while knowingly renting rooms to Plaintiff's trafficker and receiving room rental fees in exchange.

107. The ventures in which Defendant participated affected interstate commerce for numerous reasons including the sale and use of condoms, the purchase and use of cleaning supplies from out of state, the use of interstate highways to transport Plaintiff to the Travel Inn by her trafficker (and his associates), and other reasons to be proven at trial.

108. As shown above, Defendant had – at minimum – constructive knowledge that Plaintiff was being trafficked for sex at the property. See also Fed. R. Civ. P. 9(b) ("knowledge and other conditions of a person's mind may be alleged generally); *Sun Life Assurance Co. of Can. v. Imperial Premium Fin., LLC,* 904 F.3d 1198, 1215 (11th Cir. 2018) (same).

109.     Defendant directed, operated, supervised, monitored, managed, and/or employed all employees, managers, housekeepers, and other staff at their Travel Inn at all relevant times, giving Defendant specific and direct knowledge of sex trafficking, including the sex trafficking that victimized Plaintiff, and other crimes at the Travel Inn during the relevant period.

## V.   COUNT 2: PREMISES LIABILITY LAW

110.     Defendant owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the hotel safe and to not negligently create and maintain the condition(s) that caused her injury.

111.     Defendant had actual and constructive knowledge of criminal activity at the hotel that made the repeated raping of Plaintiff foreseeable to Defendant.

112.     Defendant knew or should have known of steps to take to prevent the hotel from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to correct the conditions or warn Plaintiff.

113.     Defendant was negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

a.   Failing to use ordinary care to keep the premises safe;

b.   Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the hotel;

c.   Negligently failing to properly inspect and maintain the premises;

d.   Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the hotel;

e.   Negligently failing to properly retain, hire, train, and supervise said employees;

f.  Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

g.  Negligently failing to respond to online reviews and publicly available information;

h.  Negligently failing to prevent loitering, pandering, prostitution and trespassing;

i.  Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

j.  Negligently failing to inspect, patrol, or appropriately monitor the property;

k.  Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and other measures available;

l.  Negligently failing to remediate a long history of crime at the hotel;

m.  Negligently failing to warn invitees of known hazards at the property;

n.  Negligently representing to invitees that the property was safe; and

o.  Other negligent acts that violated North Carolina common law to be proved at trial.

114.  Defendant also had a duty NOT to aid in the creation of, and NOT to maintain, a continuous and regularly repeated dangerous criminal condition at the hotel.

115.  Defendant was aware of the dangerous criminal condition at the hotel and negligently allowed that condition to continue.

116.     Defendant maintained a dangerous, criminal condition at the hotel, which caused Plaintiff to be repeatedly sexually assaulted and raped at the hotel, and Plaintiff seeks to recover for that sexual abuse.[3]

## VI. CAUSATION AND DAMAGES

117.     Each of the forgoing acts and omissions constitute an independent act of negligence on the part of Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

118.     As a direct and proximate result of Defendant's acts and omissions, Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

119.     Defendant is liable for Plaintiff's damages in an amount to be proven at trial, including reasonable attorneys' fees under 18 U.S.C. § 1595(a) and punitive damages.

120.     Plaintiff brings each and every claim for damages permissible under the law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and punitive damages permissible under the law, including, but not limited to:

      a.   Actual damages;

      b.   Direct damages

      c.   Personal injuries;

      d.   Past, present and future pain and suffering;

      e.   Disability;

---

[3] Under N.C. Gen. Stat. 1-17(d), "a plaintiff may file a civil action against a defendant for claims related to sexual abuse suffered while the plaintiff was under 18 years of age until the plaintiff attains 28 years of age." Here, Plaintiff was under 18 at the time of all of the sexual abuse, and she is currently 26.

f.   Disfigurement;

g.   Mental anguish and emotional distress (until trial and in the future);

h.   Loss of the capacity for the enjoyment of life;

i.   Loss of earning capacity;

j.   Physical pain and suffering;

k.   Emotional impairment;

l.   Unjust enrichment;

m.   Penalties;

n.   Lost wages;

o.   Diminished capacity to labor;

p.   Incidental expenses;

q.   Past, present and future medical expenses;

r.   Pre- and post-judgment interest at the maximum legal rates;

s.   Permanent injuries; Attorney's fees;

t.   Punitive damages;

u.   Exemplary Damages; and

v.   Consequential damages to be proven at trial.

## VII. JURY TRIAL

121.   Plaintiff demands a jury trial on all issues.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for a judgment against Defendant and for the following:

1)   That process and summons issue requiring Defendant to appear as provided by

law to answer the allegations of the Complaint;

2)      Plaintiff be awarded actual damages in amounts to be shown at trial against

        Defendant;

3)      Plaintiff be awarded all general, special, compensatory, economic, and other

        allowable damages in accordance with the enlightened conscience of an impartial

        jury from Defendant;

4)      Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

6)      Punitive damages be imposed upon Defendant;

7)      Plaintiff be provided with a trial by jury; and

8)      Plaintiff have such other relief as this Court deems just and appropriate under the

        circumstances.


        This 27TH day of February 2026.

                                            **THE STODDARD FIRM**
                                            */s/ Matthew B. Stoddard___*
                                            Matthew B. Stoddard, Esq.
                                            North Carolina Bar No. 62220
                                            THE STODDARD FIRM
                                            1534 N Decatur Road
                                            Atlanta, GA 30307
                                            P: 470-467-2200
                                            F: 470-467-1300
                                            matt@LegalHelpGa.com